UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ROBERT ALAN FRATTA, | § | |
| Petitioner, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO.  H-05-3392 |
| | § | |
| NATHANIEL QUARTERMAN, | § | |
| Director, Texas Department of | § | |
| Criminal Justice, Correctional | § | |
| Institutions Division, | § | |
| Respondent. | § | |

## MEMORANDUM AND ORDER

Robert Alan Fratta ("Fratta"), a Texas inmate incarcerated under a capital conviction and death sentence, filed a federal petition for a writ of habeas corpus. (Instrument No. 1).  This action comes before the Court on Respondent Nathaniel Quarterman's motion for summary judgment. (Instrument No. 18).  This federal habeas corpus proceeding concerns Fratta's challenge to his state court conviction for orchestrating the murder-for-hire of his wife, Farah Fratta.  For practical reasons, however, the Court cannot consider Fratta's challenge in a vacuum.  The claims at issue are inextricably intertwined with capital murder cases filed against Fratta's cohorts, triggerman Howard Guidry and intermediary get-away driver Joseph Prystash.  While Fratta raises several other claims requiring serious consideration, Fratta's petition emphasizes erroneous decisions on the admissibility of hearsay-laden testimony at trial, particularly the decisions to admit statements by Guidry and Prystash and testimony of Mary Gipp, which provided details about the Fratta-Prystash-Guidry plot. Having considered the pleadings, the record, and the applicable law, most particularly the operation of the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), the Court is constrained to issue a provisional writ of habeas corpus.

## FACTUAL BACKGROUND

The Court sets forth below the evidence admitted at trial and the procedural history of these interrelated cases.  The core issue in this case is the impact out-of-court statements had on the jury's consideration of evidence.  This Court will first review the evidence untainted by hearsay testimony and then turn to that allegedly improperly relating the statements of others.

### *The Facts As Developed Independent From Any Hearsay Testimony*

Fratta, a public safety officer for Missouri City, married the former Farah Baquer ("Farah") in 1983.  They had three children.  After nearly a decade, their marriage experienced difficulties, partially occasioned by Fratta's deviant sexual demands.  Trial testimony showed that Fratta's disturbing erotic desires were well known by his co-workers and acquaintances.  Farah eventually filed for divorce in March 1992.

Fratta initially did not seek sole custody of his children, though he later fought for greater custody rights.  During a deposition associated with the divorce proceedings, Farah described in crude terms how Fratta's sexual proclivities caused her to seek divorce.  The divorce court ordered a psychological and social evaluation of both parents to determine their fitness to be managing conservator of the children.  The psychological evaluation recommended that Farah be the managing conservator of the children but that Fratta have more-than-standard visitation rights.  Tr. Vol. 20 at 71-72, 118.[1]  A trial on the issue of child custody was set for November 28, 1994.

As the divorce proceedings progressed, Fratta's animosity toward his wife deepened.  The

---

[1]       The state court records consist of a transcript that contains pretrial motions, trial court orders, jury instructions, and other pleadings, cited as "Trans. at __"; a 34-volume Statement of Facts, including hearings on pretrial motions, jury voir dire, the guilt/innocence phase, and the penalty phase, cited as "Tr. Vol. __ at __"; and a transcript of the state habeas proceedings, cited as "State Habeas Record at __."

record abundantly shows that Fratta felt no restraint in expressing his desire to see his wife dead. Fratta told a friend that he would like to shoot Farah with his .9mm pistol.  Tr. Vol. 22 at 729; *see also* Tr. Vol. 23 at 791-94.  Fratta said that he would not pay child support to Farah, but would "kill her and he would be out in five years and get his kids back, but that he wouldn't pay her."  Tr. Vol. 22 at 749.  Fratta told another friend that "I'll just kill her, and I'll do my time and when I get out, I'll have my kids."  Tr. Vol. 22 at 760.  Fratta also said that he carried a gun "in case they run into Farah, [he would] shoot her [himself] and make it look like a car jacking."  Tr. Vol. 23 at 954.  Fratta had paid with a credit card for Farah to have plastic surgery – breast implants and rhinoplasty – as a condition of staying together during a previous difficult period in their marriage.  Tr. Vol. 20 at 4.  Fratta told friends that he was "not going to pay for somebody else to play with what [he] paid for."  Tr. Vol. 20 at 42.

Fratta asked several acquaintances if they knew anyone who would kill Farah.  Tr. Vol. 22 at 668; Tr. Vol. 22 at 698; Tr. Vol. 22 at 716; Tr. Vol. 22 at 730; Tr. Vol. 23 at 793; Tr. Vol. 23 at 897-99; Tr. Vol. 23 at 935-36.[2]  Fratta told one person that most cases of solicitation for murder went unsolved.  Tr. Vol. 22 at 730.  To a coworker who expressed problems with his own ex-wife, Fratta remarked that they "could solve both [their] problems if [he] would kill [Fratta's] wife, [Fratta] would kill [his]."  Tr. Vol. 22 at 748.  Fratta told a friend that he freely spoke about having

---

[2]      Fratta made several inquiries tinged with racially insensitive stereotypes.  When one individual asked Fratta why he thought that he would know of a hitman, Fratta responded "because you are Mexican and you might know some of your people that might do something like this."  Tr. Vol. 22 at 716.  Fratta insinuated to another individual of Italian-American heritage that he should have Mafia ties that could help locate a hitman.  Tr. Vol. 23 at 794.  One witness testified that the first "normal" conversation she had with Fratta, that is, "the [first] conversation that [they] had not talked about sex," was when he asked if she knew anyone, specifically any "black people," who would kill his wife.  Tr. Vol. 22 at 669-71.

3

Farah killed to cause confusion, make more witnesses that the police would have to investigate, and cloud his part in Farah's death.  Tr. Vol. 22 at 733.  He told another friend that he wanted there to be "so many leads" that "the police wouldn't know where to start . . . [or] how to conduct their investigation."  Tr. Vol.  23 at 954.

Some witnesses thought that Fratta was joking when he made such solicitations.  Tr. Vol. 22 at 665-66, 670; Tr. Vol. 23 at 936.  Some thought that he would not actually have Farah killed and that he was just "blowing off steam[.]"  Tr. Vol. 22 at 717; Tr. Vol. 22 at 751-52; Tr. Vol. 23 at 793; Tr. Vol. 23 at 902.  As his inquiries persisted, some individuals understood that Fratta was not kidding.  For instance, a friend named James Podhorsky thought that Fratta was not serious about killing his wife until Fratta began to mention certain sums of money that he would give for her murder.  Tr. Vol. 23 at 937-38.  Fratta told Podhorsky different amounts he would give, and explained he could pay some money up front and he would get the rest either from an overseas account that held the proceeds of a legal settlement for an automobile accident or from a life insurance policy on Farah.  Tr. Vol. 23 at 938-39.[3]  Fratta told Mr. Podhorsky that "he would make sure the kids would be with him so nothing would happen to them."  Tr. Vol. 23 at 941. Fratta told Mr. Podhorsky that he considered soliciting a gang to carry out Farah's murder.  Tr. Vol. 23 at 942-43.  Fratta showed Mr. Podhorsky a schedule he made of Farah's daily activities to aid the person who would kill her.  Tr. Vol. 23 at 942-43.  Mr. Podhorsky, however, did not contact the police because he thought that Fratta would never find someone to carry out the murder.  Tr. Vol. 23 at 944.

---

[3]     An overseas trust fund account held over $100,000 in the name of the Fratta children that Fratta would have been given control over at Farah's death.  Tr. Vol. 20 at 44-45.

Friends testified that Farah seemed "extremely scared" of Fratta.  Tr. Vol. 20 at 139.  She "was afraid" and acted "very subdued."  Tr. Vol. 20 at 154.  On the night of November 8, 1994, Fratta took his children to church.  Fratta's friends testified that his church attendance seemed out of the ordinary.  Witnesses at trial described how Fratta continually entered and left the church to check his pager and make phone calls.  Individuals in the church's office saw him repeatedly use the church phone between 7:30 and 8:00.  Tr. Vol. 23 at 909-10, 917-18.  Debra Normile, an individual working in the church office that night, testified that Fratta came in and asked to use the phone to return a page.  Tr. Vo. 23 at 922-23.  Fratta used the phone and stood there waiting until the phone rang.  Tr. Vol. 23 at 924.  When the phone rang, Ms. Normile tried to answer the phone, but Fratta beat her to it.  Tr. Vol. 23 at 925.  Ms. Normile told Fratta to identify the church when answering, but Fratta "answered it hello."  Tr. Vol. 23 at 925.  When Ms. Normile told him that he could not answer the phone that way, he just looked at her and continued his phone conversation.  Tr. Vol. 23 at 926.  Fratta finished his conversation, left, but then returned ten to fifteen minutes later.  Tr. Vol. 926-27.  The phone rang and Fratta answered the phone.  Ms. Normile again reprimanded Fratta for not answering the phone correctly.  Tr. Vol. 23 at 927.  Another twenty or thirty minutes later Ms. Normile saw Fratta using the phone again.  Tr. Vol. 23 at 928-29.

Farah had her hair cut on the night of the murder, leaving without having a blow dry or styling done to be on time to get the children from Fratta.  Tr. Vol. 20 at 164-65.  She pulled into her driveway at around 8:00 p.m.  About that time, the neighbor across the street, Laura Hoelscher, was sitting in her living room when she heard a gunshot.  From her position she could look directly into the Fratta's garage.  There was a light on in the garage.  Ms. Hoelscher heard Farah scream and then saw her fall to the side of the car in her driveway.  She then heard another shot.  Tr. Vol. 20 at

5

199-202.  Ms. Hoelscher's husband, Daren Hoelscher, testified that about two seconds passed between the shots.  Tr. Vol. 20 at 237.  Ms. Hoelscher saw movement next to Farah's body.  Tr. Vol. 20 at 202.[4]  Ms. Hoelscher turned down the lights in her house so that no one could see inside and called 9-1-1.  Ms. Hoelscher then saw someone behind a tree beside the Fratta house.  The man stood up, walked to the curb, looked around, and then returned to the side of the house.  Ms. Hoelscher described him as wearing black clothing and he was "either a black man or he was white and had black makeup on or something and he wasn't very tall and he had a very round head."  Tr. Vol. 20 at 211.  Mr. Hoelscher provided a similar description.  Tr. Vol. 20 at 244-45.  About two minutes later, a small silver car missing a headlight drove up, the man got into the car, and it drove away.

Mr. Hoelscher ran across the street to where Farah was lying next to the car in her driveway.  Because it had gotten dark, Mr. Hoelscher pulled his car into Farah's driveway so that his headlights would illuminate the area.  He found Farah laying in a pool of blood.  Her eyes were open and she was taking deep, swelling breaths, but she was not responsive.  Realizing that he could not help her, Mr. Hoelscher made the sign of the cross on her forehead and waited for the paramedics.

Paramedics transported Farah by ambulance to an area where a helicopter could land to lifeflight her to a hospital.  She was pronounced dead in the emergency room.  Fratta called the hospital after Farah arrived.  The person answering the phone described Fratta as "very blase [*sic*],

---

[4]      While she seemed uncertain in her trial testimony about whether she saw anything, Ms. Hoelscher told the police that she thought she saw someone wearing red pants after hearing the gunshots.  Tr. Vol. 20 at 221.  Ms. Hoelscher worried that there may have been two people outside when Farah was shot.  Tr. Vol. 20 at 222.  Her testimony conflicted somewhat with Ms. Gipp's observations of what clothing Guidry and Prystash wore on the night of the murder and her recitation of what Prystash said happened at the Fratta house.

very matter of fact, like you know even making the phone call was a big imposition" as he said "I need to know whether she's alive or dead, and I have her kids here.  Do I need to bring them in to say their goodbyes."  Tr. Vol. 24 at 1119-20.  Fratta sounded "very matter of fact.  Just cut and dry.  It was like every day, just get on with it, answer my question, go on, you know."  Tr. Vol. 24 at 1121.   When the police arrived, it was apparent that no one had gone through Farah's workout bag or purse.  Tr. Vol. 20 at 287; Tr. Vol. 21 at 338.  Fratta arrived at Farah's house around thirty minutes after the police.  Tr. Vol. 20 at 291.  Fratta did not show any sadness, concern, or surprise over his wife's death.  Tr. Vol. 20 at 292.  In fact, he seemed "very confident, very composed. Didn't appear to be emotionally upset.  Seemed to be well in command of the situation."  Tr. Vol. 21 at 382.  Fratta told the police that he wanted "to expedite this matter because he had the kids with him."  Tr. Vol. 20 at 292.  He also wanted "to take the kids to Hermann Hospital so that they could see their mother before she died."  Tr. Vol. 21 at 383.  Fratta also told the police that he was hungry. Tr. Vol. 21 at 384.  Fratta never expressed any sadness or concern to his friends over his wife's murder.  Tr. Vol. 23 at 795-800.

Fratta gave the police permission to search his vehicle.  Tr. Vol. 21 at 387-88.  Inside the glove box the police found a pistol and an envelope containing $1,050 in cash.  Tr. Vol. 21 at 392. The police also recovered an address book from Fratta's vehicle.  Tr. Vol. 21 at 396.  A neighbor agreed to watch the children while Fratta spoke with the police.  Fratta did not leave the police station for almost fifteen hours.  Tr. Vol. 22 at 464.  Detective William Valerio first interviewed Fratta for an hour and a half.  Detective Valerio thought that Fratta was being deceptive during his first interview.  Tr. Vol. 21 at 387.  Detective Valerio testified that Fratta harbored hostility towards his wife, seemed angry, and expressed no remorse for what had happened to his wife.  Tr. Vol. 21

7

at 403-04.

On the day after the murder, Fratta came to the place where his friend James Podhorsky worked.[5]  When Mr. Podhorsky asked what was going on, Fratta said "if everybody keeps their mouth shut everything will be all right."  Tr. Vol. 23 at 947.  As he made that statement, Fratta was acting "[j]ust normal, happy, smiling."  Tr. Vol. 23 at 948.  A few days later, Fratta strangely told Mr. Podhorsky "if shit ever hits the fan, just tell them that you went over there to scare her and the first bullet that you shot that went by her head actually grazed her and then you got scared and that's when you fired the second shot."  Tr. Vol. 23 at 949.  Mr. Podhorsky felt that Fratta told him such things to incriminate him.  Tr. Vol. 23 at 949-50.  Soon after the murder a friend told Fratta to "stay out of trouble" to which he replied, "What could be worse than capital murder."  Tr. Vol. 23 at 832.

A few days after the murder Fratta called the insurance agency that held a policy on Farah's life.  "[H]e was very demanding, arrogant, wanting information on the policy, on the beneficiary."  Tr. Vol. 24 at 1126.  Fratta got angry and hung up when he found out that, since it had been a homicide, the insurance company would not immediately pay out the money.  Tr. Vol. 24 at 1128.  The $100,000 policy was later paid to Farah's parents on her children's behalf.  Tr. Vol. 24 at 1130.  After Farah's murder, her parents sued for and gained custody of the children.

Sergeant Danny Ray Billingsley supervised the investigation into Farah's murder.  The police arrested Howard Guidry on March 1, 1995, after a chase resulting from a bank robbery.  When the police arrested Guidry, they found a .38-caliber Charter Arms revolver in a backpack he was carrying.  Tr. Vol. 22 at 483, 492-93.  On March 3 or 4, 1995, Mary Gipp informed Detective George Ronald "Ronnie" Roberts that Guidry had been involved in the Fratta murder.  Tr. Vol. 22

_____

[5]      The police did not arrest Fratta until April 21, 1995.

at 500.   Detective Roberts retrieved the .38-caliber revolver from the police property room.

Detective Roberts sought help from the Bureau of Alcohol, Tobacco, and Firearms to determine the

ownership of the weapon and found that Fratta purchased the weapon in 1981.  Tr. Vol. 22 at 506.

At trial, Lex Baquer, Farah's father, identified the weapon as one that his daughter had given him

for safekeeping in 1993.  Tr. Vol. 22 at 593-95.  In the summer of 1994 Baquer gave the gun to

Fratta.  Tr. Vol. 22 at 596.  Ms. Gipp testified that Fratta had given the gun to Prystash in 1994 in

exchange for work on his car.  Tr. Vol. 24 at 1089.

During her autopsy, the State recovered one full and one partial bullet from Farah's corpse.

Tr. Vol. 20 at 304.  The police recovered bullet fragments on the garage floor and in a life preserver

hanging on the garage wall.  Tr. Vol. 21 at 336-77.  The Montgomery County Sheriff's Department

compared the weapon Guidry possessed with the projectiles.  Firearms experts identified one of the

bullets conclusively as having been fired from the weapon recovered from Guidry.  Although the

other bullet could not be conclusively linked to that gun, it was fired from a similar weapon.  Tr.

Vol. 22 at 625-26.

*The Facts Derived From Hearsay-Based Testimony*

Both Guidry and Prystash confessed to their role in Farah's murder.  On March 8, 1995,

Guidry provided a written statement in which he claimed only reluctant participation in the murder

as the getaway driver.  Guidry later revised his written statement and admitted to being the gunman.

He also walked through the crime scene with the police and described the murder-for-hire scheme

and how the men carried it out.

At trial, Sgt. Danny Ray Billingsley selectively related the substance of Guidry's second

written statement and oral statements during the videotaped walkthrough, although he avoided

9

mentioning Fratta's name.  Sgt. Billingsley told the jury that Guidry said he agreed to kill Farah for $1,000, which he was to receive immediately after the murder.  On the night of the shooting, Joe Prystash gave Guidry a cell phone and a revolver.  Prystash drove Guidry, who was dressed in black, to a grocery store near the Fratta home in a grey car.  After assuring that the pay phones worked at the store, they drove by the Fratta home.  Guidry got out of the car, climbed over a fence into to the back yard, hid in a playhouse, and waited for Farah to come home.  While waiting, Guidry used the cell phone to call Prystash, who was waiting at the grocery store.

After twenty minutes, Guidry called Prystash again.  Farah then pulled her car into the driveway.  Guidry got out of the playhouse and stood next to the garage.  When Farah opened the garage door, Guidry stepped into the garage, pointed his gun at her, and shot Farah once in the head. He turned to leave, but, realizing that Farah was still moving, turned and shot her again in the head. Guidry then left the garage, went back to the playhouse, and called Prystash.  Guidry hid by a bush on the side of the garage.  Around thirty seconds later Prystash drove up.  Guidry got into the car. Guidry initially gave Prystash back the phone and gun, but Prystash later returned the gun and told Guidry to dispose of it.  Guidry was never paid for the murder.  Tr. Vol. 22 at 528-544.

The police arrested Prystash on March 8, 1995, after Guidry confessed.[6]  When confronted with Guidry's second statement, Prystash invoked his right to remain silent.  The police decided to release Prystash from custody.  Sgt. Billingsley stated that when he drove Prystash to his car, Prystash made an oral confession to being the getaway driver.  The police did not arrest Prystash for

---

[6]     The police initially arrested Prystash on November 18, 1994, but he disclaimed any knowledge of the murder.

five days.[7]  On March 13, 1995, the police again took Prystash into custody.  He signed a written confession that was generally consistent with Guidry's second written statement.  Sgt. Billingsley testified at trial about the oral statements Prystash made on March 8, 1995.

According to Sgt. Billingsley, Prystash confirmed that he had solicited Guidry's help in killing Farah.  Sgt. Billingsley stated that Prystash related the same events described by Guidry, confessing his role not only in securing Guidry's help, but also his part in directing Guidry on how to carry out the shooting.  Prystash confessed that he was to receive a couple thousand dollars and a vehicle for his involvement.  Tr. Vol. 22 at 559-67.

The testimony of Mary Gipp, Prystash's girlfriend, tied together various threads of the State's case.  The police interacted with Ms. Gipp for months without her incriminating Prystash, Guidry, or Fratta.  When called before a grand jury on March 1, 1995, she initially refused to testify, but soon reached an immunity agreement with the district attorney's office.  On March 3, 1995, Ms. Gipp gave an oral statement which was reduced to writing and signed the next day.  Her statement incriminated Guidry, Prystash, and Fratta, and served as the impetus for the police interrogation of Guidry and Prystash.

At trial, Ms. Gipp provided testimony springing from her observations of Prystash, particularly on the night of the murder, but laced that account with statements made by Prystash. Ms. Gipp testified that she knew the Frattas from the gym where she worked out.  She also met Prystash there.  About six months before Farah's death, Ms. Gipp noticed that Prystash and Fratta's relationship grew closer.  One day a few weeks before the murder Ms. Gipp saw Fratta and Prystash

---

[7]      The record provides no information as to why the police waited five days to arrest Prystash after his oral confession.

11

go into the locker room to talk together.  Ms. Gipp told a friend that she was mad about their association because "Bob wanted Joe to kill Farah."  Tr. Vol. 24 at 1052.  Ms. Gipp testified that Prystash agreed to his part in Farah's murder in return for a jeep and $1,000.  Tr. Vol. 24 at 1087.  Ms. Gipp testified that Prystash let her know when Farah's murder was to occur.  Tr. Vol. 24 at 1053.  She left work early that day because she could not concentrate.  Tr. Vol. 24 at 1054.  Ms. Gipp went home to call Farah and tell her about the murder, but, since she did not know Farah's last name, she could not contact Farah.  Tr. Vol. 24 at 1054.  On the day of the murder, she saw Guidry at the top of the stairs by her apartment.  Guidry told Ms. Gipp he was waiting for Prystash.  Tr. Vol. 24 at 1062.  Prystash arrived home shortly thereafter, dressed in black.  Tr. Vol. 24 at 1062-63.  Guidry likewise was dressed in black.  Tr. Vol. 24 at 1063.  Ms. Gipp knew when they left the apartment that they were going to kill Farah.  Tr. Vol. 24 at 1065.

Guidry and Prystash returned at about 8:30 p.m.  Prystash came into the apartment and began unloading spent cartridges from a revolver.  Tr. Vol. 24 at 1067.  Ms. Gipp identified the gun as the one the police recovered from Guidry.  Tr. Vol. 24 at 1068.  After Prystash unloaded two cartridges, Ms. Gipp asked Prystash if they killed Farah.  He responded "Yes."  Tr. Vol. 24 at 1070.  Prystash told Ms. Gipp that Guidry "killed her in the garage."  Tr. Vol. 24 at 1070.  Prystash then threw the spent cartridges into a garbage can.   Prystash then left to go to  the gym.  After Prystash left, Ms. Gipp took the cartridges out of the garage can.  She also wrote down the gun's serial number.  Tr. Vol. 24 at 1074-75.  Ms. Gipp later threw away the shells, but gave the serial number to the police. Tr. Vol. 24 at 1075-76.

The day after the murder Prystash replaced a burned-out headlight in his car.  Tr. Vol. 24 at 1084.  Prystash also more fully described the murder to Ms. Gipp.  Tr. Vol. 24 at 1083-84.  Prystash

told her that Guidry "was waiting for [Farah] in the garage and that he shot her once in the head, and then she flew back and he shot her again." Tr. Vol. 24 at 1084. Prystash waited at a nearby pay phone until Guidry called the cell for to pick him up. Tr. Vol. 24 at 1084. Ms. Gipp testified that Prystash gave the murder weapon to Guidry and told him to dispose of it. Tr. Vol. 24 at 1086. Prystash eventually had his car crushed. Tr. Vol. 24 at 1085.

Ms. Gipp broke up with Prystash not long after the murder. Tr. Vol. 24 at 1112. Because of her foreknowledge of the crime and her ability to stop Farah's murder, the trial court instructed the jury to decide if Ms. Gipp was an accomplice to the crime, which then required them to find that other evidence or testimony corroborated her account. Tr. Vol. 26 at 1518-19.

## PROCEDURAL HISTORY

A grand jury indicted Fratta for the capital murder of his wife. The indictment allowed for Fratta's conviction under only one theory, remuneration:

> The duly organized Grand Jury of Harris County, Texas, presents in the District Court of Harris County, Texas, that in Harris County, Texas, Robert Alan Fratta, hereafter styled the Defendant, on or about November 9, 1994, did then and there unlawfully, intentionally, and knowingly cause the death of Farah Fratta, hereafter styled the Complainant, by shooting the complainant with a deadly weapon, namely a firearm, and *the Defendant did employ Joseph Prystash to commit the murder for remuneration and the promise of remuneration, namely a motor vehicle.*

> It is further presented that in Harris County, Texas, Robert Alan Fratta, hereafter styled the defendant, heretofore on or about November 9, 1994, did then and there unlawfully, intentionally, and knowingly cause the death of Farah Fratta, hereafter styled the Complainant, by shooting the Complainant with a deadly weapon, namely a firearm, and *the Defendant did employ Howard Guidry to commit the murder for remuneration and the promise of remuneration, namely, money.*

Trans. at 6 (emphasis added). Fratta was tried in the 230th District Court for Harris County, Texas

with the Honorable Judge Robert N. Burdette presiding.[8]   A jury found Fratta guilty of capital

murder and returned answers to Texas' special issues that required the imposition of a death

sentence.  In separate trials, Guidry and Prystash also received death sentences for their roles in the

murder.

On direct appeal, Fratta raised several claims including challenges to Sgt. Billingsley's

account of the co-conspirators' statements and to Ms. Gipp's hearsay account of Prystash's

statements.  The Court of Criminal Appeals' adjudication on direct appeal has resulted in much

confusion. On February 17, 1999, the Court of Criminal Appeals entered a decision authored by

Judge Lawrence E. Meyers affirming Fratta's conviction and sentence.  The Court of Criminal

Appeals' first opinion erroneously considered Fratta's confrontation clause claims under case law

that only applied to the redaction of a co-defendant's statements during a joint trial – a circumstance

inapplicable in Fratta's case.[9]  On its own motion, the Court of Criminal Appeals granted rehearing.

On July 30, 1999, the Court of Criminal Appeals withdrew its original decision and issued two new

opinions.  A new opinion by Judge Meyers addressed all the issues Fratta raised on appeal, and the

court unanimously adopted his resolution of claims 13 through 66.  However, a majority did not join

---

[8]        Michael Charlton and John Ackerman represented Fratta at trial.  The Court will refer
to Fratta's attorneys conjointly as "trial counsel" or "defense counsel."

[9]        The Court of Criminal Appeals analyzed Fratta's claim in context of three Supreme
Court cases involving the redaction of incriminating statements made by a co-defendant in a joint
trial, *Gray v. Maryland*, 523 U.S. 185 (1998), *Richardson v. Marsh*, 481 U.S. 200 (1987), and
*Bruton v. United States*, 391 U.S. 123 (1968).   The *Richardson* line of cases holds that "the
Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession
with a proper limiting instruction when . . . the confession is redacted to eliminate not only the
defendant's name, but any reference to his or her existence."  *Richardson*, 481 U.S. at 211.  The
Court of Criminal Appeals concluded that the redaction of the confessions through Sgt. Billingsley's
selected recitation of their contents made his hearsay-based testimony admissible.

Judge Meyers' discussion of claims 1 through 12 – those involving Guidry and Prystash's statements – which he found admissible under a traditional hearsay exception and general constitutional law. A majority instead joined an opinion written by Judge Paul Womack which only addressed Guidry and Prystash's out-of-court statements. Judge Womack's opinion held that Sgt. Billingsley's testimony about the confession was not admissible under any hearsay exception, but nonetheless did not violate federal law.

Significant difficulty has followed, especially because the Court of Criminal Appeals did not clearly distinguish the two majority opinions. For instance, a majority of the Court of Criminal Appeals joined Judge Meyers' treatment of the challenge to Ms. Gipp's testimony which relied on his erroneous legal analysis of the other confrontation clause claims. The state habeas court also incorrectly relied on Judge Meyers' opinion in resolving a similar challenge to Guidry and Prystash's confessions. Additionally, Respondent initially based his summary judgment motion on the withdrawn opinion. To avoid perpetuating further confusion, the Court will refer to the opinion by Judge Meyers as "Opinion on Direct Appeal (Meyers) at ___" and that by Judge Womack as "Judge Womack Opinion at ___."

After he unsuccessfully sought state habeas relief, this Court appointed counsel to represent Fratta in his federal habeas proceeding. Fratta's federal petition raises the following grounds for relief:

1. The prosecution's reliance on hearsay testimony relating to the confessions by co-defendants Joseph Prystash and Howard Guidry violated Fratta's Sixth Amendment right to confrontation.

2. Ms. Gipp's hearsay-laden testimony in the guilt/innocence phase violated Fratta's Sixth Amendment right to confrontation.

3. The admission of prejudicial testimony from Fratta's divorce proceedings

15

violated Fratta's Sixth Amendment right to confrontation.

4.    The prosecution sponsored misleading testimony in the guilt/innocence phase
      regarding Fratta's sexual proclivities.

5.    The trial court's exclusion of expert testimony violated Fratta's due process
      rights.

6.    The prosecution suppressed materially favorable evidence from the defense.

7.    The prosecution suppressed evidence that would have impeached one of its
      witnesses.

8.    Fratta is actually innocent of capital murder.

9.    The prosecution deprived Fratta of his Sixth Amendment right to counsel by
      failing to notify the defense of its intent to present evidence of Fratta's
      deviant sexual practices.

10.   External factors influenced the jury's verdict.

11.   The cumulative effect of the errors rendered Fratta's trial fundamentally
      unfair.

12.   The prosecution sponsored false and misleading testimony through Mary
      Gipp's inconsistent testimony.

13.   Texas law did not authorize the trial judge to preside over Fratta's trial.

14.   The evidence insufficiently showed Fratta to be a future societal danger.

15.   The prosecution violated Fratta's constitutional rights by commenting on his
      failure to testify in the punishment phase.

This Court initially denied summary judgment because Respondent relied on the Court of

Criminal Appeals' withdrawn opinion in its briefing. (Instrument No. 15).  Respondent again moves

for summary judgment, arguing that the application of the AEDPA's deferential standard of review

and other federal law prevents this Court from granting federal habeas relief.  (Instrument No. 19).

16

Fratta has responded to the renewed summary judgment motion.[10]  (Instrument No. 20).  This case is now ripe for adjudication.

## STANDARD OF REVIEW

"[T]he writ of habeas corpus has historically been regarded as an extraordinary remedy, a bulwark against convictions that violate fundamental fairness."  *Brecht v. Abrahamson*, 507 U.S. 619, 633 (1993) (quotation omitted); *see also Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979) (Stevens, J., concurring in judgment) (stating that "habeas corpus is not intended as a substitute for appeal, nor as a device for reviewing the merits  of guilt determinations at criminal trials[,] but it is designed to guard against extreme malfunctions in the state criminal justice systems").  The AEDPA governs and guides federal review of Fratta's habeas petition.  Congress enacted the AEDPA "at least in part, to ensure comity, finality, and deference to state court habeas determinations by

---

[10]        Throughout these proceedings, Fratta has actively filed *pro se* pleadings and letters in an attempt to supplement his attorneys' efforts.  The Court has not authorized Fratta to proceed in a hybrid manner.  Hybrid representation occurs when a criminal defendant proceeds represented "partly by counsel, partly by himself."  *Neal v. State*, 870 F.2d 312, 315 (5th Cir. 1989) (quoting *United States v. Daniels*, 572 F.2d 535, 540 (5th Cir. 1978)).  There is no constitutional right to hybrid representation.  *See Myers v. Johnson*, 76 F.3d 1330, 1335 (5th Cir. 1996)*; Daniels*, 572 F.2d at 540.  The right to appointed counsel and to appear *pro se* are "mutually exclusive."  *United States v. Nivica*, 887 F.2d 1110, 1121 (5th Cir. 1989).  "In all courts of the United States the parties may plead and conduct their own cases personally *or* by counsel as, by the rules of such courts, respectively, are permitted to manage and conduct causes therein."  28 U.S.C. § 1654 (emphasis added).  "This is not to say that hybrid representation is foreclosed; rather, it is to be employed sparingly and, as a rule, available only in [the court's] discretion."  *Nivica*, 887 F.2d at 1121.  The Court has guarded Fratta's constitutional rights by the appointment of competent attorneys. Counsel for Fratta obviously reviewed the prior proceedings and, in that process, has presumably winnowed out weaker claims to allow for the presentation of a strong and viable petition.  As this Court appointed counsel, it is unnecessary and inappropriate for Fratta to represent himself, particularly insofar his pleadings seek to introduce new, and procedurally deficient, claims into these proceedings.  Thus, Fratta's *pro se* pleadings are, at best, unnecessary.  The Court nevertheless has reviewed Fratta's *pro se* contentions and will take any cogent arguments into consideration in adjudicating the instant petition.

17

limiting the scope of collateral review and raising the standard for federal habeas relief." *Robertson v. Cain*, 3243 F.3d 297, 306 (5th Cir. 2003); *see also Williams v. Taylor*, 529 U.S. 420, 436 (2000) (noting the "AEDPA's purpose to further the principles of comity, finality, and federalism"). Under the AEDPA, a federal court can only grant relief if a state court's adjudication of a constitutional claim was "contrary to, or involved an unreasonable application of, clearly established Federal law" or "was based on an unreasonable determination of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d).[11] The AEDPA also presumes underlying state factual findings to be correct, unless the petitioner "rebut[s] the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see also Miller-El v. Cockrell*, 537 U.S. 322, 341 (2003).

Notwithstanding a petitioner's compliance with 28 U.S.C. § 2254(d)(1) and (2), no Supreme Court case "ha[s] suggested that a writ of habeas corpus should automatically issue if a prisoner satisfies the AEDPA standard[.]" *Horn v. Banks*, 536 U.S. 266, 272 (2002); *see also Robertson v. Cain*, 324 F.3d 297, 306 (5th Cir. 2003) (finding that 28 U.S.C. § 2254(d) "does not require federal habeas courts to grant relief reflexively"). A habeas corpus petitioner meeting his burden under 28 U.S.C. § 2254(d) must still comply with jurisprudential tenets, such as the harmless-error doctrine and the non-retroactivity principle, that bridle federal habeas review. *See Thacker v. Dretke*, 396 F.3d 607, 612 n.2 (5th Cir. 2005). Accordingly, any trial error cannot form the basis for federal

---

[11]    "A state-court decision is contrary to [the Supreme Court's] clearly established precedents if it applies a rule that contradicts the governing law set forth in [its] cases, or if it confronts a set of facts that is materially indistinguishable from [a Supreme Court decision] but reaches a different result." *Brown v. Payton*, ___ U.S. ___, 125 S. Ct. 1432, 1438 (2005); *see also Williams v. Taylor*, 529 U.S. 362, 405-406 (2000); *Price v. Vincent*, 538 U.S. 634, 640 (2003); *Early v. Packer*, 537 U.S. 3, 7-8 (2002). A state court unreasonably applies federal law "if the state court applies [Supreme Court] precedents to the facts in an objectively unreasonable manner." *Payton*, ___ U.S. at ___, 125 S. Ct. at 1438; *see also Williams*, 529 U.S. at 407.

habeas relief unless it "ha[d] a 'substantial and injurious effect or influence in determining the jury's verdict.'" *Robertson*, 324 F.3d at 304 (quoting *Brecht*, 507 U.S. at 629); *see also Aleman v. Sternes*, 320 F.3d 687, 690-91 (7th Cir. 2003) ("Nothing in the AEDPA suggests that it is appropriate to issue writs of habeas corpus even though any error of federal law that may have occurred did not affect the outcome."). A habeas court likewise cannot grant relief if it would require the creation of new constitutional law. *See Banks*, 536 U.S. at 272; *Teague v. Lane*, 489 U.S. 288 (1989).

## ANALYSIS

## I.    CONFRONTATION CLAUSE VIOLATIONS

Fratta's first two claims argue that the admission of out-of-court statements through Sgt. Billingsley and Ms. Gipp's testimony violated the Confrontation Clause. The Sixth Amendment's Confrontation Clause provides that "in all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. amend VI. The Constitution's contempt for unreliable out-of-court statements is clearly established. "The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." *Maryland v. Craig*, 497 U.S. 836, 845 (1990). "When the government seeks to offer a declarant's out-of-court statements against the accused, and . . . the declarant is unavailable, courts must decide whether the Clause permits the government to deny the accused his usual right to force the declarant to submit to cross-examination, the greatest legal engine ever invented for the discovery of truth." *Lilly v. Virginia*, 527 U.S. 116, 124 (1999) (quotation and footnote omitted).

"If one were to read [the Confrontation Clause] language literally, it would require, on objection, the exclusion of any statement made by a declarant not present at trial" and would

"abrogate virtually every hearsay exception." *Ohio v. Roberts*, 448 U.S. 56, 63 (1980). The Supreme Court, however, "has rejected such an extreme interpretation of the Clause." *United States v. Ismoila*, 100 F.3d 380, 391 (5th Cir. 1996); *see Wright*, 497 U.S. at 814 ("While a literal interpretation of the Confrontation Clause could bar the use of any out-of-court statements when the declarant is unavailable . . . that view [is] unintended and too extreme."). Instead, the Supreme Court has previously recognized that the Confrontation Clause restricts out-of-court testimony in two ways. First, "when a hearsay declarant is not present for cross-examination at trial, the Confrontation Clause normally requires a showing that he is unavailable." *Roberts*, 448 U.S. at 66; *see also Idaho v. Wright*, 497 U.S. 805, 816 (1990).[12] Second, a statement only becomes admissible "if it bears adequate 'indicia of reliability.'" *Roberts*, 448 U.S. at 66. "Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception. In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness." *Id.* at 66.[13]

---

[12]     Because Guidry and Prystash relied on their Fifth Amendment rights to avoid testifying at trial, the "general requirement for unavailability" is met in this case. *Wright*, 497 U.S. at 815.

[13]     The Supreme Court recently revolutionized the use of confessions in criminal cases in its seminal decision, *Crawford v. Washington*, 541 U.S. 36 (2005). The Supreme Court broke from its previous jurisprudence, observing that "[w]here testimonial statements are involved, we do not think the Framers meant to leave the Sixth Amendment's protection to the vagaries of the rules of evidence, much less to amorphous notions of 'reliability.'" *Id.* The Supreme Court found that "[t]he unpardonable vice" of its previous jurisprudence was "its demonstrated capacity to admit core testimonial statements that the Confrontation Clause plainly meant to exclude." *Id.* at 63. In place of the *Roberts* framework, the *Crawford* court laid out a more uniform test: a statement becomes admissible only after a showing of "unavailability and a prior opportunity for cross-examination." *Id.* at 68. Respondent argues that the *Crawford*'s more-restrictive use of confessions has no applicability in the present case. Under the non-retroactivity principle established in *Teague v. Lane*, 489 U.S. 288, 310 (1989), "[u]nless they fall within an exception to the general rule, new
(continued...)

20

The Fifth Circuit's recent consideration of Guidry's confession and the admissibility of Ms. Gipp's testimony in *Guidry v. Dretke*, 397 F.3d 306 (5th Cir. 2005), strongly influences this Court's review of Fratta's petition.  In *Guidry*, the Fifth Circuit affirmed the lower court's grant of habeas relief, finding that police misconduct caused Guidry to confess.  *See Guidry*, 397 F.3d at 329.  The Fifth Circuit also found that Ms. Gipp's hearsay account of Prystash's statements violated the Sixth Amendment's Confrontation Clause.  *See id.* at 330.[14]  Fratta argues that *Guidry* guides this Court's consideration of the out-of-court statements admitted in his case.  This Court will consider the admissibility of each group of statements and then review their combined impact at trial.

### A.    Admission of Testimony Relating Selected Content from Joseph Prystash and Howard Guidry's Statements

Sgt. Billingsley testified that Guidry confessed to the police. Tr. Vol. 22 at 514-15.  Before Sgt. Billingsley could relate any statements made by Guidry, trial counsel objected because "it's eventually based on hearsay.  It communicates in essence what Guidry told them.  That deprives us

---

[13]        (...continued)
constitutional rules of criminal procedure will not be applicable to those cases which have become final before the new rules are announced."  "[A] federal court considering a habeas petition must conduct a threshold *Teague* analysis when the issue is properly raised by the state."  *Horn v. Banks*, 536 U.S. 266, 272 (2002).  The Fifth Circuit has joined the "majority of other circuits that have held or suggested that *Crawford* should not be applied retroactively."  *Lave v. Dretke*, 444 F.3d 333, 336 (5th Cir. 2006); *Summers v. Dretke*, 431 F.3d 861, 877 (5th Cir. 2005) ("*Crawford* . . . is not retroactive[.]").  The Supreme Court has confirmed that *Crawford* does not apply retroactively. *See Whorton v. Bockting*, ___ U.S. ___, 127 S. Ct. 1173, 1181 (2007).  As Fratta's direct review concluded well before the Supreme Court decided *Crawford*, *Teague* bars any extension of that case to the instant petition.  Fratta makes no effort to rely on *Crawford*, other than to cite it for general Sixth Amendment principles.

[14]        The State of Texas recently retried Guidry for Farah's murder.  The prosecution apparently based its case against Guidry on testimony not presented at his first trial.  Guidry again received a death sentence.  The fact that Guidry received a new death sentence has no influence in the Court's consideration of the evidence presented at Fratta's trial.

of the right to cross examine Mr. Guidry because he is after all a co-defendant in this particular case and [has] a great deal of motive to shift responsibility elsewhere[.]" Tr. Vol. 22 at 516.  In a discussion out of the jury's presence, the prosecution explained that Guidry's testimony would

> indicate that he was in fact the trigger man, the he used [the murder weapon], and that he went to Food City with Joe Prystash and that he participated to the extent that he was given a cellular phone and that weapon . . . by Joe Prystash at the Food City or on the way over there.  And that he was dropped off at Farah Fratta's residence and he shot her twice, was picked up by Joe Prystash who took him home and that he expected to receive for his actions $1,000 in cash.

Tr. Vol. 22 at 521-22.  The State assured that it only sought to elicit those statements directly incriminating Prystash and Guidry, and would not "go[] into anything wherein he understood who was going to pay him" Tr. Vol. 22 at 523.  Trial counsel objected that allowing that testimony

> establishes significant elements of our case without giving us the opportunity to cross examine Mr. Guidry. . . . . What is important is that Mr. Guidry has disavoided [*sic*] this statement in its entirety.  He is, we've been informed through his lawyers that he says the only reason he gave the statement is because the police beat him up and that his statement is not voluntary.  It ain't true.  It didn't happen and we can't establish that.  We can't cross examine him and we can't establish that this is not a true statement according to Guidry.  I mean I don't know what else to say except that this would, I think in my opinion denies us a significant opportunity to cross examine, cross examine which we think would be very fruitful to us.

 Tr. Vol. 22 at 524.  The trial court overruled the defense's objections and allowed Sgt. Billingsley to relate portions of Guidry's incriminating statements.  Tr. Vol. 22 at 526.  Trial counsel repeatedly objected throughout Sgt. Billingsley's recitation of Guidry's statements.

    The prosecution also questioned Sgt Billingsley about Prystash's oral statements.  Tr. Vol. 22 at 556.  The defense again objected that "what they are going to do is go into the same kind of wide spread collateral discussion that has nothing to do with the self-inculpatory statement, but included a lot of other material that goes to establish the elements of their case and would therefore not be admi[ssible]." Tr. Vol. 22 at 556-57.  The defense alleged that

22

like Mr. Guidry, Mr. Prystash has completely disavoided [*sic*] this statement and claims that it's an involuntary statement gotten from him as a result of being beaten by the police officers.  Secondly, he invoked his right to counsel in front of Mr. Rizzo of the District Attorney's Office before these statements were made.  The right to counsel is not honored by this detective or any other detective associated with interrogating Mr. Prystash.  So we are now requesting an opportunity and move now to suppress Mr. Prystash's statement on those additional constitutional grounds as well as the confrontation issues we have raised before. . . .  We don't think it's a voluntary statement.  We think if there were a chance to inculpate our client in addition to everything we've raised.

Tr. Vol. 22 at 557-58.

The trial court allowed Sgt. Billingsley to testify about his conversation with Prystash which identically mirrored Guidry's account of the murder.  Tr. Vol. 22 at 559-68.  During Sgt. Billingsley's examination, the State had both Guidry and Prystash brought into the courtroom for the purposes of identification.  Tr. Vol. 22 at 565-66.  After Sgt. Billingsley's testimony, the following discussion occurred:

| The Court: | . . . Mr. Ackerman, it is your opportunity to cross examine. |
|---|---|
| Trial counsel: | That's correct.  Since this witness simply testified as to statements made by Mr. Guidry, I would ask[] that you order the deputy [to] bring him back out and put him on the stand so I can cross examine Mr. Guidry as to his statement. |
| The Court: | That request will be denied. |
| Trial counsel: | I want to make the same request of Mr. Prystash.  I would like to cross examine Mr. Prystash. |
| The Court: | Same ruling. |
| Trial counsel: | I have no questions of this witness.  *He didn't say anything that he knows*. |
| The prosecution: | I object to the side bar. |
| The Court: | That's sustained. |

23

Tr. Vol. 22 at 572 (emphasis added).

Trial counsel's closing argument in the guilt/innocence phase accurately summed up the

concerns with the use of Guidry and Prystash's statements:

> The biggest gap of all.  And that's Joe Prystash and Howard Guidry.  Surely some
> of you, some of us had to have watched Perry Mason when we were children.  If you
> didn't, if you're too young, you surely must have watched the other lawyer shows,
> were did the climax of those shows always occur.  When some lawyer, admittedly
> better than most of us, would come up to this person on the stand and in cross
> examination get that person to admit the truth.  And the climax of the story would
> occur there.  Cross examination is the engine of truth.  It is how the truth is brought
> to citizens like yourself who sit in judgment.  Where have you heard that, cross
> examination.  It's the fundamental element of what makes criminal trial fair.  And
> you haven't seen it.

> You're being asked to take on faith what Joseph Prystash and Howard Guidry told
> the police.  You have no idea why they said, what they did.  You have no real idea
> whether they, in fact, said it.  Whether they still maintain that.  You have no idea
> what considerations may have been offered.  You have no idea whether there are
> confessions that were coerced and you have no idea, anything at all about the
> circumstances under which those statements were made.  Because you never heard
> from those individuals.  You can't tell whether they are telling the truth.  You have
> no way of knowing that because you didn't see them on that witness stand where
> every lawyer who talked to you about this case said the evidence had to come from,
> that witness stand.  You never saw them.  How can you possibly evaluate whether
> they are telling the truth.  It is really that, that angers me so much.  That you cannot
> provide, you cannot test, you cannot challenge, you cannot do anything about that.

Tr. Vol. 26 at 1544-46.  The defense later continued:

> [Y]ou're being asked to render a verdict without the fundamental engine, the
> fundamental tool with which we have to determine truth in a courtroom.  The right
> to confront and cross examine those people who would testify against you.  The right
> to expose to them the liars they are.  And without that you are being asked to take
> everything on faith.  You are being asked to put a man's life in balance without
> determining whether these people have told the truth.

Tr. Vol. 26 at 1551.

Fratta challenged the introduction of testimony about Guidry's and Prystash's statements on

direct appeal.  Judge Womack's majority opinion held that "the hearsay statements in this case are

24

declarations against penal interest.  The use of such a statement to inculpate another defendant is not within a firmly rooted exception to the hearsay rule."  Judge Womack Opinion at 2.  The Court of Criminal Appeals ultimately rejected his claim with the following discussion:

> The admission of the statements in this case did not violate the Confrontation Clause. The declarants were unavailable.  The statements had particularized guaranties of trustworthiness.  The most important guarantee is that the statements of Guidry and Prystash were not of the character condemned [in Supreme Court jurisprudence]. The statements that were admitted in evidence in this case did not attempt to implicate [Fratta] while exonerating the declarants.  They did not mention [Fratta] at all, and they fully implicated the declarants as guilty parties.  In addition, they were corroborated by physical evidence at the crime scene, by the observations of other witnesses, by telephone records, by other evidence, and by each other.

Judge Womack Opinion at 2-3 (footnote omitted).

The Court of Criminal Appeals identified two factors that made Guidry and Prystash's statements reliable for the purposes of the *Roberts* test: (1) additional evidence at trial corroborated the confessions and (2) the statements did not implicate Fratta while exonerating his co-conspirators and, in fact, "[t]hey did not mention [Fratta] at all."  Judge Womack Opinion at 3.  The Court of Criminal Appeals' decision was both contrary to, and an unreasonable application of, federal law.[15]

---

[15]     Fratta again challenged Sgt. Billingsley's recitation of Guidry and Prystash's statements on state habeas review, this time in the context of an ineffective-assistance-of-counsel claim and in light of the federal district court's bestowal of habeas relief in Guidry's case. Specifically, Fratta's state habeas claim was that "[t]rial counsel failed to provide effective assistance of counsel, in violation of Mr. Fratta's rights under the Sixth and Fourteenth Amendments to the United States Constitution, when they failed to move in advance of trial for a remedy sufficient to protect Mr. Fratta's right to defend against the confessions of Howard Guidry and Joseph Prystash."  State Habeas Record at 15.  The state habeas court found that claim to be "essentially a re-working of [Fratta's] rejected direct appeal challenge to the admissibility of the co-defendant's statements."  State Habeas Record at 773, ¶ 14.  The state habeas court incorrectly relied on Court of Criminal Appeals' withdrawn opinion and found that the admission of the statements did not violate Texas' evidentiary rules.  State Habeas Record at 774, ¶ 17.  Also, the state habeas court found that "[t]he trial court properly admitted the statements of [Fratta's] co-defendants: statements that inculpated the co-defendants, not [Fratta], and qualified as statements against interest
(continued...)

A.      Corroboration by Trial Evidence

The Court of Criminal Appeals found that additional evidence from the trial corroborated the hearsay statements communicated by Sgt Billingsley.  Respondent concedes that justifying the admission of hearsay testimony through corroboration is contrary to Supreme Court precedent. (Instrument No. 18 at 21 n.18) ("[T]he court incorrectly relied upon corroborating evidence to determine trustworthiness.").  In *Idaho v. Wright*, 497 U.S. 805, 823 (1990), the Supreme Court expressed concern that "the use of corroborating evidence to support a hearsay statement's 'particularized guarantees of trustworthiness' would permit admission of a presumptively unreliable statement by bootstrapping on the trustworthiness of other evidence at trial[.]"  "The Confrontation Clause analysis excludes corroborating evidence because the rationale for allowing the evidence is that the statement offered is free enough from the risk of inaccuracy and untrustworthiness, so that the test of cross-examination would be a work of supererogation."  *United States v. Bell*, 367 F.3d 452, 467 (5th Cir. 2004) (quotations omitted).  The Supreme Court, therefore, holds that reliance on corroborating evidence is "at odds with the requirement that hearsay evidence admitted under the Confrontation Clause be so trustworthy that cross-examination of the declarant would be of marginal

---

[15]      (...continued)
under TEX. R. CRIM. EVID. 803(24), now TEX. R. EVID. 908(24)."  State Habeas Record at 790, ¶ 3. The state habeas court found that the statements "were corroborated, pursuant to TEX. R. CRIM. EVID. 803(24), now TEX. R. EVID. 803(24), by the following: co-defendant Guidry's possession of the murder weapon at the time of his arrest for the Klein bank robbery; phone records from the night of the offense; autopsy reports; ballistics reports; testimony by the complainant's neighbors concerning viewing the offense; [Fratta's] actions near the time of the murder; and, observations made by co-defendant Prystash's girlfriend, Mary Gipp."  State Habeas Record at 790-91, ¶4.  The state habeas court replicated the Court of Criminal Appeals finding that the trial court "properly admitted the statements of [Fratta's] co-defendants that did not violate [Fratta's] right to confrontation; [Fratta] was not implicated by anything in either co-defendant Prystash's statement or co-defendant Guidry's statement and the co-defendant's statements were redacted to remove [Fratta's] name and any reference to his existence."  State Habeas Record at 791, ¶5.

utility." *Wright*, 497 U.S. at 823; *see also Lilly*, 527 U.S. at 137-38 ("We have squarely rejected the notion that ' evidence corroborating the truth of a hearsay statement may properly support a finding that the statement bears 'particularized guarantees of trustworthiness.'").  Corroborating evidence more properly factors into deciding whether error, if any, was harmless.  *See Wright*, 497 U.S. at 822.  The Court of Criminal Appeals' decision can only stand if Guidry and Prystash's statements possessed sufficient indicia of reliability by virtue of inherent trustworthiness.

B.      Indicia of Reliability

The Sixth Amendment disfavors the admission of out-of-court statements.  "'[S]tatements accusatory of another taken by law enforcement personnel with a view to prosecution' should 'generally be regarded as inadmissible under the Confrontation Clause' because they are 'inherently unreliable.'"  *Bell*, 367 F.3d at 467 (quoting *United States v. Flores*, 985 F.2d 770, 780 (5th Cir. 1993)); *see also Lee v. Illinois*, 476 U.S. 530, 547 (1986) ("[W]hen one person accuses another of a crime under circumstances in which the declarant stands to gain by inculpating another, the accusation is presumptively suspect and must be subjected to the scrutiny of cross-examination.").  The Supreme Court recognizes two ways to verify the reliability of a hearsay statement: "[r]eliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception.  In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness."  *Roberts*, 448 U.S. at 67.

Judge Womack's majority opinion explicitly found that the declaration-against-penal-interest exception to the hearsay rule was not firmly established.[16]  Judge Womack Opinion at 2.  That

---

[16]      To the extent that the state habeas court relied on state evidentiary law to sanction the admission of Guidry and Prystash's statements, it rendered a decision inconsistent with federal

(continued...)

holding is consistent with federal law.  *See Lilly*, 527 U.S. at 134 n.5.  Because the statements cannot be considered inherently trustworthy, this Court must look at whether other indicia of reliability make Sgt. Billingsley's testimony admissible.

Neither the *circumstances* surrounding Guidry and Prystash's statements nor their *content* provides any inherent basis for considering them trustworthy.[17]  Respondent has not shown that the *circumstances* surrounding Guidry and Prystash's statements engender any presumptive confidence. Guidry and Prystash both confessed while in police custody.  Particular care must be taken when "the government is involved in the statements' production and when the statements describe past events and have not been subjected to adversarial testing."  *Lilly*, 527 U.S. at 137.  "When a suspect is in custody for his obvious involvement in serious crimes, his knowledge that anything he says may be used against him militates against depending on his veracity."  *Id.* at 138.  "[U]nless an affirmative reason, arising from the circumstances in which the statement was made, provides a basis for rebutting the presumption that a hearsay statement is not worthy of reliance at trial, the Confrontation Clause requires exclusion of the out-of-court statement."  *Wright*, 497 U.S. at 821.

At trial, defense counsel argued that both Guidry and Prystash retreated from their statements and claimed that they only confessed because of police misconduct.  The trial court made no effort to explore the question of whether the circumstances surrounding those statements created an

_____

16          (...continued)
law.  The portion of the Court of Criminal Appeals's second opinion written by Judge Meyers also incorrectly found that hearsay exception to be firmly rooted.  The *Lilly* Court expressly found that "a confession by an accomplice which incriminates a criminal defendant does not come within a firmly rooted hearsay exception."  *Lilly*, 527 U.S. at 134 n.5.

17          Judge Womack's opinion focused on the *content* of the confessions rather than the *circumstances* surrounding their creation.

atmosphere of reliability.  While Respondent correctly notes that Fratta had no standing to challenge the violation of his co-defendants' rights under the Fifth Amendment, *see United States v. Cardenas-Alvarado*, 806 F.2d 566, 574 (5th Cir. 1986), Respondent provides no basis upon which the trial court could have been assured that the confessions bore sufficient indicia of reliability.

The Fifth Circuit's holding in *Guidry* handicaps Respondent's position.  The Fifth Circuit succinctly outlined the police deception resulting in Guidry's confession:

> On 1 March 1995, Guidry was arrested for bank robbery; in his possession was the gun used to murder Farah Fratta on 9 November 1994.  On 7 March 1995, while Guidry was being held on the bank-robbery charge, Detectives Roberts and Hoffman questioned him about Farah Fratta's murder, resulting in his confession.
>
> The testimony at the pre-trial hearing on Guidry's motion to suppress the confession provided sharply contrasting versions of the interrogation leading to the confession. Guidry claimed: his robbery-charge attorney had instructed him not to discuss anything with anyone; therefore, when interrogated about Farah Fratta's murder, Guidry requested his attorney; after his second request, Detectives Roberts and Hoffman left the room; on returning, they advised Guidry they had contacted his attorney, who had given Guidry permission to answer their questions; and, in reliance on such alleged permission, Guidry confessed.

*Guidry v. Dretke*, 429 F.3d 154, 155 (5th Cir. 2005).  The Honorable Vanessa Gilmore held an evidentiary hearing that confirmed that the police secured Guidry's confession through deceit.  The Fifth Circuit affirmed.

This Court cannot turn a blind eye to the fact that *Guidry* revealed that the police blatantly violated Guidry's rights before taking his statements.[18]  At trial Sgt. Billingsley testified that Guidry

---

[18]     Respondent weakly tries to avoid the factual insight given in *Guidry* by arguing that a strict application of the exhaustion doctrine prevents consideration of those facts. While Fratta did not, and could not, rely on the *Guidry* opinion on direct appeal, on state habeas review he gave the state courts an opportunity to consider its effect in a "reworking" of his prior claim.  State Habeas Record at 773, ¶ 14.  The state courts used the ineffective-assistance claim to ascertain whether Sgt. Billingsley's  testimony was admissible under Texas law or the Constitution.  The state courts
(continued...)

had been cooperative when he confessed to Farah's murder, Tr. Vol. 22 at 515, but he did not reveal that police deception alone secured Guidry's cooperation.[19]  Respondent concedes that, if the Court takes *Guidry* into consideration, "it is difficult to argue that this hearsay statement bore sufficient indicia of reliability" and leads "to a conclusion that the admission of this statement violated Fratta's Sixth Amendment confrontation rights."  (Instrument No. 18 at 24).  The *Guidry* case confirms that at least one confession was not trustworthy.

Nonetheless, Respondent doggedly argues that the trial court properly allowed Sgt. Billingsley to relate the contents of Prystash's oral statement.  While Prystash has all along challenged the integrity of his confession, no court has yet found it deficient.  However, even if this Court did not consider the influence of *Guidry*, nothing in the record proves that, as the facts existed before the trial court and have subsequently been developed, Prystash's statements could be guaranteed as trustworthy.  Respondent asks this Court to assume that Prystash' confession was reliable.  Respondent does not show any reason to place inherent confidence in Prystash's statement. Nothing in the record rebuts the general presumption against attributing any reliability to the out-of-court statements.  The record gives no reason to assume that the circumstances assured that Prystash's confession is reliable.

---

[18]        (...continued)
refused to find that the *Guidry* case in any way changed its analysis of the reliability of Guidry's confession.  Even then, the state habeas court relied on Judge Meyers' non-majority opinion and otherwise misapplied federal law.  Fratta gave the state courts a sufficient opportunity to consider the *Guidry*'s impact.

[19]        The *Guidry* court did not identify Sgt. Billingsley as being involved in the subterfuge that secured Guidry's confession, though "supervisor Danny Billingsley . . . was the second officer present during the conversation."  *Guidry*, 397 F.3d at 332.  Sgt. Billingsley also supervised the videotaped walkthrough of the crime scene.

30

The *content* of the statements likewise does not lead to a high level of confidence.  The Court of Criminal Appeals upheld the introduction of the statements because they "were not of the character condemned [in Supreme Court jurisprudence].  The statements *that were admitted in evidence* in this case did not attempt to implicate [Fratta] while exonerating the declarants.  They did not mention [Fratta] at all, and they fully implicated the declarants as guilty parties."  Judge Womack Opinion at 3-4 (emphasis added).  Respondent candidly admits that in making this evaluation "the court considered only the redacted versions of the confessions instead of viewing the statements as a whole[.]"  (Instrument No. 18 at 20).  Federal law decisively holds that "it is not just the portions of the statement that are offered into evidence that are considered when the court is determining the trustworthiness of the statement, the redacted portions are considered as well."  *Bell*, 367 F.3d at 468.  A court must look at the entire, unredacted statement to determine trustworthiness.  *See Williamson v. United States*, 512 U.S. 594, 603 (1994) ("[W]hether a statement is self-inculpatory or not can only be determined by viewing it in context.").  The fact that Sgt. Billingsley carefully chose what information to convey to the jury cannot render them trustworthy.

Respondent, nonetheless, seeks to distinguish this case from Supreme Court precedent by arguing that "[t]he confession of Guidry and Prystash stand in stark contrast to [the non-self-inculpatory statements in *Lilly*].  Guidry and Prystash's statements were primarily self-inculpatory. That is, there was no attempt to minimize their respective criminal liability and shift the blame to the defendant."  (Instrument No. 18 at 21).  The Supreme Court has recognized that "the very fact that a statement is genuinely self-inculpatory . . . is itself one of the 'particularized guarantees of trustworthiness' that makes a statement admissible under the Confrontation Clause."  *Williamson*, 512 U.S. at 605.  Respondent urges that "[b]oth Guidry and Prystash readily admitted to being the

31

parties directly involved in the shooting and death of Farah Fratta.  Guidry, in particular, admitted to actually shooting the victim.  Although their confessions referenced Fratta's involvement, there was no attempt to minimize their own culpability."  (Instrument No. 18 at 21).  Contrary to Respondent's assertion, the statements themselves, in their unredacted form, laid heavy blame on Fratta and strongly implicated him in the capital murder while minimizing the other actors' involvement and intent.  Also, Guidry and Prystash not only fully inculpated Fratta in the murder, their statements unevenly and contradictorily spread the blame between *each other* for the killing.

"[T]hat a person is making a broadly self-inculpatory confession does not make more credible the confession's non-self-inculpatory parts.  One of the most effective ways to lie is to mix falsehood with truth, especially truth that seems particularly persuasive because of its self-inculpatory nature."  *Williamson*, 512 U.S. at 599-600.  As noted in federal review of Guidry's death sentence, the co-conspirators had "every reason to attempt to spread the blame for Farah Fratta's death and inculpate [each other] in the murder-for-hire."  *Guidry*, 397 F.3d at 329.  The unredacted written statements of Guidry and Prystash each, while inculpatory, also inconsistently spread responsibility for her murder among the co-conspirators.[20]

Guidry's first unredacted confession, while admitting to his role in the murder, contains elements that sought to disperse the culpability for Ms. Fratta's murder, primarily to Prystash. Guidry stated that he initially told Prystash that he "really did not want to be part of it."  Guidry also accused Prystash of wanting to rape Farah before he killed her.  Guidry reported that Prystash coarsely referred to the victim as "Bitch."  Guidry only agreed to participate when Prystash told him

---

[20]     The Court reviews the written statements as no record exists of Guidry and Prystash's oral statement.  The written statements mirror the trial testimony and provide a fuller view of the declarant's version of the murder-for-hire plot.

that "all [he had] to do is drive the car."  Even then, Guidry himself expressed that his minor role

as the getaway driver troubled him greatly: "I stayed up all night thinking about what I did."  Guidry

even explained that he did not wish to be paid: "I never did get paid for doing the job.  I finally told

[Prystash] not to worry about it anymore because I didn't want to get into trouble."  State Habeas

Record at 71-73.

Guidry's second statement revised his allocation of blame.  Guidry's second statement again

downplayed his enthusiasm for the crime.  Guidry placed more blame for the crime on Prystash than

on himself: "It was the same plan as I told you before, except Joe said he was going to drive and I

was to do the shooting.  I did not plan it that way, Joe told me how he wanted it done."  Guidry still

insisted that Prystash wanted to rape Farah, but this time stated that Fratta ordered the rape:

> Joe was saying she was "fine" and was saying she was so pretty.  He said he wanted
> to rape her.   Joe said her husband wanted to set her up by putting some dope in her
> purse.  Joe said the husband wanted him to kill her and make it look like it was some
> kind of wild sex act.  Joe said her husband wanted him to have sex with her and then
> choke her with a coat hanger.

In contrast to his first statement, Guidry gave a detailed description of Fratta's governing role in the

murder and his specific instructions on how to carry out the plan.  Guidry's second statement places

all of the planning on Prystash and Fratta, with Guidry only participating as a follower.  Guidry even

claimed to have tried to avert committing the murder by lying about a police car driving past as he

lay in wait.  When Guidry got back to the apartment, he had little concern for receiving his payment:

"[Prystash] came out of his apartment and said he couldn't get in touch with Bob.  I said whatever.

I told him that I was going in my apartment and was going to try to sleep."  State Habeas Record at

74-76.

Prystash's written statement paints Guidry's involvement in a different light.  Guidry was

33

not only an enthusiastic participant, but also a key planner. When approached about possibly killing Farah, Guidry "told [him] that he needed to make some money and he didn't care what he did." Guidry was not the hesitant follower as depicted in his own statement, but showed "interest right from the beginning because he wanted to go buy some cocaine, and sell it." Guidry, in fact, chose the murder weapon ("Howard had decided that he wanted to use the gun.").

Prystash described Fratta as the mastermind of the operation, creating several scenarios for the murder, including making it seem like his wife was engaged in a drug deal. Prystash also described Guidry as the one who planned some elements, including choosing Prystash to be the driver of the get-away car. Prystash represented himself as only a conduit for communication between Fratta and the gunman who reluctantly became the getaway driver at the last minute. Prystash also described Guidry as "real mad about not getting paid." Prystash also acted depressed about his role in the murder and fearful of Fratta: "I've been depressed ever since this happened. I didn't sleep a lot of nights because I felt bad about it. Bob called me several times after it happened to find out if my girlfriend Mary Gipp knew anything. I was afraid that Bob might hurt Mary by getting her involved. I didn't want Mary to have anything to do with the whole situation." State Habeas Record at 82-86.

Guidry and Prystash's statements show that the declarant had little enthusiasm for the murder, but then attribute anxious elements of the planning to the other declarant or to Fratta. Guidry and Prystash each mitigated their participation in the crime by ascribing a greater role to the other declarant and to Fratta. No cross-examination allowed the defense to explore these inconsistencies. Contrary to Respondent's position the statements, while self-incriminatory, heartily implicate the other men in the murder.

34

This is certainly not a case where "the declarant's truthfulness is so clear from the surrounding circumstances that the test of cross-examination would be of marginal utility." *Wright*, 497 U.S. at 820. The record, when considered under the correct legal standards, demonstrates that both statements were not reliable. For the reasons described above, this Court finds that the Court of Criminal Appeals' adjudication of Fratta's confrontation clause claim was contrary to and an unreasonable application of federal law. *See* 28 U.S.C. § 2254(d)(1).

As this claim is interrelated to the constitutionality of admitting hearsay testimony from Prystash's girlfriend, the Court will first review whether the trial court should have permitted Ms. Gipp to relate Prystash's out-of-court statements, then turn to the impact the challenged testimony had on Fratta's trial.

## B.    Admission of Hearsay Through Mary Gipp's Testimony

At trial, the prosecution called Prystash's girlfriend, Ms. Gipp, to testify concerning statements Prystash made about Farah's murder. Before the prosecution called Ms. Gipp to the stand, the defense objected that she would base her testimony on hearsay statements made by Prystash that would violate Fratta's right to cross-examination and confrontation. Tr. Vol. 24 at 1020. The trial court allowed Ms. Gipp to testify. Ms. Gipp's testimony was not entirely saturated with hearsay. Fratta only challenges three groups of hearsay statements related by Ms. Gipp.

In the first set of statements, Ms. Gipp described her feelings as Prystash and Fratta entered the locker room at the gym to discuss the murder plot. Because Prystash told her about the murder-for-hire plot, she was "[j]ust kind of shocked" and "a little angry" and told a friend that "Bob wanted Joe to kill Farah." Tr. Vol. 24 at 1051-53. In the second set of statements, Ms. Gipp recounted that Prystash described on the night of the murder how Guidry killed Farah and that Prystash said he was

35

going to the gym "to get a thousand dollars" from Fratta.  Tr. Vol. 24 at 1068-71.  Finally, Ms. Gipp

related statements Prystash made to her the day after the murder including a more-detailed account

of the murder.  Tr. Vol. 42 at 1082-84.

> During closing arguments, the defense severely criticized Mary Gipp's testimony:
>
> What a guilty person does is try to shed the blame.  Try to focus the blame on someone else.  Give the police what they want so he or she can get out of trouble.
>
> You know that from Mary Gipp.  Mary Gipp, she was told by the police, she says, she could be prosecuted for murder.  So she starts shifting the blame.  She starts shifting the focus somewhere else, to Robert Alan Fratta.  You have no idea whether Mr. Guidry or Mr. Prystash did the same thing because you haven't heard from them.  You haven't seen them except when they were marched into the courtroom.  You haven't had the opportunity of deciding whether they can be believed.
>
> . . .
>
> Mary Gipp, there is a truism I suppose that says if you know, that if you make up a story and it's not true, you are going to get some details wrong.

Tr. Vol. 26 at 1547-49.  Trial counsel then discussed various problems with Ms. Gipp's testimony,

and told the jury "in short you have no way to test the reality of this."  Tr. Vol. 26 at 1551.  The jury

charge allowed the jury to determine whether Ms. Gipp was an accomplice.  Tr. Vol. 26 at 1518-19.

If they found her to be an accomplice then the jury could not "convict [Fratta] upon the testimony

of Mary Gipp unless [the jury] further believe[d] that the testimony of Mary Gipp is true . . . [and]

tending to connect [Fratta] to the offense charged in the indictment[.]" Tr. Vol. 26 at 1518-19.

Fratta contends that these three groups of hearsay violated the Confrontation Clause.[21]  The

---

[21]     Respondent argus that Fratta failed to exhaust his challenges to Ms. Gipp's testimony because he did not give the state courts an opportunity to consider the federal implications of Ms. Gipp's testimony.  Respondent errs with respect to the scope of the state proceedings.  On direct appeal, Fratta raised each of the challenged groups of testimony as different grounds for relief.  With regard to the first set – Ms. Gipp's testimony that she was angry because Fratta wanted Prystash to
(continued...)

Case 4:05-cv-03392   Document 24   Filed in TXSD on 09/28/07   Page 37 of 49

Confrontation Clause anticipates "'a personal examination and cross-examination of the witness, in which the accused has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief.'" *Roberts*, 448 U.S. at 63 (quoting *Mattox v. United States*, 156 U.S. 237, 242-43 (1895)).  As previously noted, the admission of hearsay evidence

---

21          (...continued)
kill his wife – the Court of Criminal Appeals found that Fratta "assert[ed] in subsequent points of error that admission of all the statements Prystash made to Gipp was a violation of his right to confrontation and cross-examination of the witnesses against him.  He has failed to apply the laws governing confrontation and cross-examination to this particular fact scenario, however, and has failed to present anything for review under these theories.  See TEX. R. APP. P. 38.1(h)."  Opinion on Direct Appeal (Meyers) at 24.  The Texas Rules of Appellate procedure required Fratta to direct the state appellate court to the specific places in the record on appeal that supported his contentions.  *See* TEX. R . APP. P. 38.1(h) ("The brief must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record.").  Finding that Fratta did not brief a federal constitutional argument, the Court of Criminal Appeals proceeded to consider whether Texas' evidentiary law required suppression of that portion of Ms. Gipp's testimony.  Respondent argues that "[a]lthough Fratta challenged the admissibility of these statement[s] by Prystash on state law hearsay grounds, Fratta did not seek review on federal constitutional grounds." (Instrument No. 18 at 28).  Respondent misapprehends the state court judgment.  The Court of Criminal Appeals only questioned the specificity of the briefing with regard to the first set of hearsay testimony.  Fratta provided mostly state evidentiary case law to support his claim, but also noted that the state law followed *Williamson v. United States*, 512 U.S. 594 (1994), which considered whether the admission of hearsay evidence violated the Confrontation Clause.  "A claim is not exhausted unless the habeas petitioner provides the highest state court with a 'fair opportunity to pass upon the claim,' which in turn requires that the applicant "present his claims before the state courts in a procedurally proper manner according to the rules of the state courts." *Mercadel v. Cain*, 179 F.3d 271, 275 (5th Cir. 1999) (quoting *Dupuy v. Butler*, 837 F.2d 699, 702 (5th Cir. 1988)). This is not a case where Fratta did not "apprise the state court of his claim that the . . . ruling of which he complained was not only a violation of state law," *Duncan v. Henry*, 513 U.S. 364, 366 (1995), nor did the state court need to look beyond "a petition or a brief (or a similar document)" to be aware of Fratta's federal claim, *Baldwin v. Reese*, 541 U.S. 27, 32 (2004).  While amplification of Fratta's superficial Sixth Amendment claim would have aided the Court of Criminal Appeals in its decision process, he adequately relied on federal law in state court for the purposes of the exhaustion doctrine.  This Court will consider the substance of Fratta's Sixth Amendment challenge to Ms. Gipp's first recitation of hearsay testimony.

violates the Constitution unless "the veracity of hearsay statements is sufficiently dependable to allow the untested admission of such statements against an accused" such as "when (1) 'the evidence falls within a firmly rooted hearsay exception' or (2) it contains 'particularized guarantees of trustworthiness' such that adversarial testing would be expected to add little, if anything, to the statements' reliability." *Lilly*, 527 U.S. at 124-25 (quoting *Roberts*, 448 U.S. at 66). This Court finds that Ms. Gipp's hearsay account of Prystash's statements violated the Constitution.

With at least the third group of Ms. Gipp's testimony, the Court of Criminal Appeals considered whether federal law prohibited recitation of Prystash's hearsay statements. The Court of Criminal Appeals piggybacked that discussion on Judge Meyers' non-majority resolution of Fratta's challenge to Sgt. Billingsley's testimony:

> [u]nder the same analysis as that set out [in rejecting the challenges to Prystash and Guidry's confessions], the trial court was within his discretion to determine that this testimony constituted statements against the declarant's (Prystash's) interest and was therefore admissible. Further, because the testimony does not implicate [Fratta], [his] confrontation and cross-examination rights are not implicated.

Opinion on Direct Appeal (Meyers) at 28. Serious problems exist with that analysis. First, the decision refers to the portion of Judge Meyers' opinion that misapplied federal law and was not endorsed by a majority of that court. The decision endorsed by a majority, in fact, found that "declarations against penal interest . . . is not within a firmly rooted exception to the hearsay rule." Judge Womack Opinion at 2. As previously discussed, *Lilly* and other federal cases have clearly held that statements cannot be held admissible by relying on the declarations-against-interest exception to the hearsay rule. Second, the statements fully implicated Fratta in the murder-for-hire scheme. Ms. Gipp clearly stated that Prystash not only went to the gym to get money, but that he went to get $1000 from Fratta. Her testimony as a whole in this regard filled in otherwise-absent

details about the murder-for-hire that strongly implicated Fratta.

The record gives no basis upon which to evaluate Prystash's credibility when he allegedly made the statements to Ms. Gipp.  In *Guidry*, the Fifth Circuit found that the same testimony by Ms. Gipp violated Guidry's constitutional rights.  *See Guidry*, 397 F.3d at 329.[22]  While recognizing its "persuasive authority," Respondent makes several arguments to denigrate the precedential effect of that holding, none of which overcome its influence in this case.[23]  The interests of justice prevent this Court from overturning the Fifth Circuit's decision in *Guidry*, and the irregularity of finding Ms. Gipp's testimony permissible only in this case would be unsettling to the orderly administration of justice.  This Court must decide whether the introduction of the hearsay account, in conjunction with Prystash and Guidry's confessions, was harmless error.

### C.  Harmlessness of the Error Resulting from the Introduction of Guidry and Prystash's Confessions and Ms. Gipp's Hearsay-Laden Testimony

"[S]ome constitutional errors do not entitle the defendant to relief, particularly habeas relief." *Calderon v. Coleman*, 525 U.S. 141, 147 (1998).  The wrongful admission of hearsay evidence

---

[22]    The Fifth Circuit observed:

Part of Gipp's hearsay testimony concerned the following statements by Prystash against Guidry's interest: Prystash was going to take Guidry to the Frattas' home on the night of the murder; Prystash and Guidry killed Farah Fratta; Guidry shot her in the head as she exited her vehicle; after the murder, Prystash picked Guidry up in Prystash's automobile; after the murder, Guidry was to receive $1000 for the murder; and, on the night of the murder, Prystash was to obtain that $1000 for Guidry from Robert Fratta.

*Guidry*, 397 F.3d at 329.  The prosecutor elicited the same testimony in this case.

[23]    For instance, Respondent accuses the Fifth Circuit of "rest[ing] its decision] on the faulty premise that the Court of Criminal Appeals found that Gipp's testimony violated the Confrontation Clause," (Instrument No. 18 at 36), without recognizing that the Fifth Circuit engaged in its own independent confrontation clause analysis.  *See Guidry*, 397 F.3d at 329-30.

violates the Confrontation Clause only when the evidence was a 'crucial, critical or highly significant factor in the framework of the whole trial.'" *Gochicoa v. Johnson*, 118 F.3d 440, 446 (5th Cir. 1997) (quoting *Cupit v. Whitley*, 28 F.3d 532, 536 (5th Cir. 1994)).  In making that assessment, the Fifth Circuit generally considers "five general factors derived from the Supreme Courts opinion in *Dutton v. Evans*, 400 U.S. 74, 87, 91 S. Ct. 210, 219, 27 L.Ed.2d 213 (1970):

> (1) whether the hearsay evidence was 'crucial' or 'devastating';

> (2) whether prosecutors misused a confession or otherwise engaged in misconduct;

> (3) whether a joint trial or the wholesale denial of cross-examination was involved;

> (4) whether the most important prosecution witness, as well as other prosecution witnesses, was available for cross-examination; and

> (5) the degree to which the hearsay evidence is supported by 'indicia of [its] reliability'."

*Gochicoa*, 118 F.3d at 446 (quoting *Cupit*, 28 F.3d at 532).  The *Dutton* factors, however, are "somewhat redundant in light of the harmless error rule." *Gochicoa*, 118 F.3d at 447 n.5; *see also Wright*, 497 U.S. at 832 (noting that the *Dutton* factors properly apply to a determination of harmlessness).

"Confrontation Clause errors [are] subject to . . . harmless-error analysis." *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986).  Under *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993), a defendant must show that the error resulted in "actual prejudice."  Actual prejudice is present if the error "had substantial and injurious effect or influence in determining the jury's verdict." *Id.* at 637 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).  In looking at the error, federal courts

> consider the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or

40

contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and of course, the overall strength of the prosecution's case.

*United States v. Edwards*, 303 F.3d 606, 623 (5th Cir. 2002) (quoting *Hafdahl v. Johnson*, 251 F.3d 528, 539-40 (5th Cir. 2001)).[24]  "The Court must find that the error, in the whole context of the particular case, had a substantial and injurious effect or influence on the jury's verdict."  *Coleman*, 525 U.S. at 504.  However, "where a judge, in a habeas proceeding, applying this standard of harmless error, 'is in grave doubt as to the harmlessness of an error,' the habeas 'petitioner must win.'"  *California v. Roy*, 519 U.S. 2, 5 (1996) (quoting *O'Neal v. McAninch*, 513 U.S. 432, 437 (1995)).

Respondent bases his summary judgment motion almost exclusively on the argument that, notwithstanding the disposition of the *Guidry* case, Sgt. Billingsley's recitation of Prystash's statements was still admissible.  Respondent assumes that the other out-of-court statements were only cumulative of Prystash's statements to Sgt. Billingsley.  (Instrument No. 18 at 25, 34, 38).  The improper admission of Prystash's statements cannot forgive the constitutional violation in the admission of Guidry's statements and Ms. Gipp's testimony.

Without marshaling any evidence, Respondent otherwise argues that "unlike in Guidry's case, there is evidence proving that Fratta, Prystash, and Guidry collaborated to kill Farah. Furthermore, the evidence complained of here is mostly incriminating of Guidry.  Consequently,

_____

[24]      The Court of Criminal Appeals only made a harmlessness determination with respect to the first set of statements made by Ms. Gipp.  There, the Court of Criminal Appeals applied the more-forgiving standard from *Chapman v. California*, 386 U.S. 18 (1967).  "In this circuit-at least when the state court did not perform its own harmless-error review-we simply apply the *Brecht* harmless-error analysis."  *Garcia v. Quarterman*, 454 F.3d 441, 447 (5th Cir. 2006) (relying on *Robertson*, 324 F.3d at 306.

Guidry's confession and Prystash's statement could be construed as more damaging in Guidry's trial than Fratta's." (Instrument No. 18 at 38). This Court will review the trial evidence in comparison to that from *Guidry*.[25]

The fatal error identified by the *Guidry* case was that, absent the constitutionally defective confession and testimony, no evidence proved that Guidry committed a murder *for remuneration*.[26]

---

[25]    With regard to the first hearsay statement conveyed by Ms. Gipp, the Court of Criminal Appeals found it to be harmless because it had "sufficient assurance" that "the error, if any, did not influence the jury or had but a slight effect." Specifically, the Court of Criminal Appeals found that

> the State put on several witnesses who testified that [Fratta] either solicited them to kill his wife, asked them if they knew of anyone who he could hire to kill his wife, or just generally talked to them about wanting his wife killed. Even Edens testified that [Fratta] approached him on several occasions, including just four hours before the murder, looking for someone he could hire to kill his wife. That Prystash was another person solicited was, in effect, cumulative evidence. Furthermore, Edens testified that he took [Fratta's] comments to be simply venting of anger regarding his current divorce proceedings.

Opinion on Direct Appeal (Meyers) at 24. While the Court finds in the text that follows above that the trial court improperly allowed Ms. Gipp's testimony to come before the jury and that it harmed the defense, the Court of Criminal Appeals was not incorrect to find that portions of Ms. Gipp's first testimony was cumulative of other testimony.

[26]    The Fifth Circuit concluded:

> Moreover, there is no evidence tying Guidry to the charged capital offense of murder for remuneration. Under Texas law, proof of murder for remuneration or promise of remuneration requires a "focus .. . on the actor's intent or state of mind: Did the actor kill in the expectation of receiving some benefit or compensation"? *Urbano v. State*, 837 S.W.2d 114, 116 (Tex. Crim. App. 1992). Of course, this state of mind element must be proved beyond a reasonable doubt; "[i]f the evidence at trial raises only a suspicion of guilt, even a strong one, then that evidence is insufficient". *Id.* Although $1050 was found in Robert Fratta's vehicle, there is no admissible evidence tying Guidry to it.

> The district court's conclusions were correct. Without the confession and challenged
>
> (continued...)

Under Texas law, "the State has the *heavy burden* of demonstrating that the murder was performed for the reason of pecuniary gain." *Rice v. State*, 805 S.W.2d 432, 435 (Tex. Crim. App. 1991) (emphasis added). "Texas Penal Code § 19.03(a)(3) defines the elements of capital murder for remuneration as: (1) a person (2) intentionally or knowingly (3) causes (4) the death of an individual (5) for remuneration or the promise of remuneration." *Ex parte Granger*, 850 S.W.2d 513, 516-17 (Tex. Crim. App. 1993).[27]   Here, the guilt/innocence instructions required the jury to find Fratta guilty if he "intentionally employed Joseph Prystash and/or Howard Guidry to kill Farah Fratta; and the defendant, Robert Alan Fratta, paid or promised Joseph Prystash and/or Howard Guidry to kill Farah Fratta as alleged in the indictment[.]"   The instructions expressly required the jury to find that Fratta employed Prystash "to commit the murder for remuneration or the promise of remuneration, namely, a *motor vehicle*" and that Guidry did so for "*money*."   Trans. at 280-81 (emphasis added).

The admissible evidence suggested that Fratta was somehow involved in his wife's murder. Fratta had a motive for killing his wife, though the parties debate the source, nature, and seriousness of that motive.   The Court of Criminal Appeals has "found that the nexus between a defendant who kills for pecuniary gain and his motive for that act is more important than the motive of a defendant who kills during the course of other felonious conduct." *Rice*, 805 S.W.2d at 435.   Proof of murder for remuneration "focus[es] on the actor's intent or state of mind: Did the actor kill in the

---

[26]      (...continued)
hearsay, there is insufficient evidence to convict Guidry of murder for remuneration or promise of remuneration.

*Guidry*, 397 F.3d at 331.

[27]      The jury instruction stated that "'[r]emuneration' means payment by one person to another in compensation for a specific service or services rendered pursuant to an agreement." Trans. at 279.

expectation of receiving some benefit or compensation?"  *Urbano v. State*, 837 S.W.2d 114, 116 (Tex. Crim. App. 1992).  "If the evidence at trial raises only a suspicion of guilt, even a strong one, then the evidence is insufficient."  *Id.*

Fratta acted suspiciously before the murder.  Fratta freely expressed that he wanted his wife dead.  Fratta repeatedly asked if acquaintances knew a hitman.  Fratta even expressed a desire to commit the murder himself and regain custody of his children after serving a prison term.  Many witnesses felt that Fratta was not serious in his desire to see Farah killed.  Others, however, took Fratta seriously, especially after he specified dollar amounts he would give for her death.  Fratta's discussions showed detailed planning toward the commission of the murder: he would make arrangements so his children would not be at the killing, he made a schedule of Farah's daily activities, and he acted to obscure the actual murder plot.

After the murder, Fratta displayed no remorse, concern, or distress over Farah's murder.  Fratta seemed composed and in control of the situation.  Later, he expressed anger at police questioning.  He also seemed happy in the days after the killing, even to the point of visiting a strip club on the night of Farah's funeral.  He also seemed morbidly interested in receiving money from Farah's life insurance policy.  Fratta told people that "if everybody keeps their mouth shut everything will be all right."  Tr. Vol. 23 at 947.

Even considering the abundant evidence that Fratta wanted to see his wife dead, absent the inadmissible testimony scant evidence supported the allegations in the indictment.  Some facts suggested that Prystash and Guidry played a part in Farah's murder.  The admissible testimony by Ms. Gipp placed Prystash and Guidry together on the night of the murder.  Prystash drove a car similar to the one seen picking up the gunman.  Witnesses saw someone similar looking to Guidry

at the Fratta house. The identification of Guidry, however, is far from conclusive. As noted in *Guidry*,

> without the confession or Prystash's statements implicating Guidry, there is little evidence of Guidry's participation in the murder. Although the neighbors testified they observed a black male at the scene, they could not positively identify Guidry and told police they thought the assailant could be white.

*Guidry*, 397 F.3d at 330.

Some evidence inferred that Prystash connected Fratta to Guidry. Phone records showed that Fratta and Prystash spoke around the time of the murder. The prosecution showed that Fratta owned the murder weapon. Ms. Gipp's non-hearsay testimony placed the gun in Prystash's possession on the night of the murder. "And, although Guidry had the murder weapon in his possession when he was arrested in early 1995, this was four months after the murder, when the gun was used in the commission of a robbery." *Guidry*, 397 F.3d at 330. None of this information proved that a murder-for-hire occurred.[28]

The improperly admitted testimony more than superficially impacted the jury's consideration of whether the alleged Fratta-Prystash-Guidry plot involved a murder *for remuneration*. For the effect of the hearsay testimony to be harmless, untainted trial testimony would not only have to connect Fratta, Prystash, and Guidry to the murder, but also indicate that the men engaged in the murder for pecuniary reasons. *See Janecka v. State*, 739 S.W.2d 813, 839 (Tex. Crim. App. 1987) (Duncan, J., dissenting) ("[C]ommon sense, if nothing else, demands that to prove such an allegation the State has to prove that someone gave the appellant money to kill the deceased or promised to do

---

[28]     The police also found over a thousand dollars in cash and a pistol in Fratta's vehicle. Fratta's possession of cash at the time of the murder was insufficient in Guidry's case to uphold the remuneration requirement – nothing in the present case makes that evidence stronger.

so."). Other than the incriminating comments that flowed freely from Fratta, the State's case against Fratta was largely circumstantial. Circumstantial evidence may have been enough to show that Fratta wanted his wife killed. Only the inadmissible statements by Guidry and Prystash and Ms. Gipp's hearsay-laden testimony neatly tied that circumstantial evidence into a coherent prosecutorial theory of capital murder as alleged in the indictment.[29]

The specificity of the indictment required the prosecution to show that Fratta contracted to pay money and a vehicle for his wife's murder. The prosecution's opening argument emphasized the importance of the inadmissible testimony: "Had it not been for Mary Gipp, the police could have never put Joe Prystash and Howard Guidry together and without those two connections and their eventual arrest, you would have never heard about or this defendant wouldn't be sitting here today." Tr. Vol. 20 at 29. While Fratta spoke freely to others about having her murdered for money, the admissible trial testimony does not disclose his agreement – if any – with Prystash and Guidry. As noted by Fratta,

> Each confession contained highly incriminating information vital to conviction under the indictment and in accordance with the jury charge. Hearsay attributed to Guidry was the jury's sole source of evidence for the execution of a murder for hire plan. The State did not support specific allegations in the indictment that Mr. Fratta promised to pay cash and cars, specifically, a Jeep and several thousand dollars in cash, to Prystash through any other source of evidence other than Prystash's custodial confession.

(Instrument No. 20 at 12). Because the indictment required affirmative proof of a murder-for-hire plot, and the trial evidence otherwise did not divulge pecuniary collusion between Fratta, Guidry, and Prystash, this Court finds that the inadmissable testimony had a substantial and injurious effect

---

[29]     Ms. Gipp's first set of hearsay – that she was "shocked" and "mad" when Fratta and Prystash spoke together – is rather harmless, except to the extent that Ms. Gipp based her emotions on knowledge of the planned murder she derived from speaking with Prystash.

of the trial.

Here, the prosecutors misused out-of-court statements that were not supported by any indicia of reliability, were not subject to cross-examination, and came from the prosecution's most crucial witnesses. The Court, however, approaches the grant of habeas relief with some reservation. Fratta was far from a sympathetic defendant. The trial evidence showed Fratta to be egotistical, misogynistic, and vile, with a callous desire to kill his wife. The evidence *strongly* suggested that Fratta was *somehow* involved in his wife's death. Nevertheless, the Constitution places high demands on a State's ability to carry out the ultimate punishment – and those standards have not been met in this case. However responsible Fratta may have been for his wife's death, he was not guilt of capital murder for remuneration absent the introduction of constitutionally inadequate testimony. The Court will issue a conditional writ of habeas corpus on Fratta's confrontation clause claims.

## II.    CLAIMS NOT MERITING HABEAS RELIEF

The remainder of the claims Fratta raises in his federal habeas petition do not call for habeas relief. The Court has reviewed the legal and factual basis for each claim, examined relevant portions of the record, and considered the applicable law, particularly the AEDPA's deferential standards. Some of the claims Fratta raises are not cognizable on federal review (claim 8) or only involve the application of state law (claims 9, 13). Other claims come before the Court in a procedurally deficient manner (claims 12, 15). Fratta raises serious accusations, such as his claims under *Brady v. Maryland*, 373 U.S. 83 (1963), and his allegations about the improper admission of testimony (claims 3-7), which, while requiring sober consideration, did not materially affect the outcome of his trial. Even considering the merits of all his other claims, Fratta does not show terrible

47

constitutional violations by the trial participants; rather, his claims typify the maxim that "the Constitution entitles a criminal defendant to a fair trial, not a perfect one." *Van Arsdall*, 475 U.S. at 681.

Federal habeas relief only lies for those claims involving Ms. Gipp and Sgt. Billingsley's recitation of out-of-court statements. Under the appropriate legal standards, the Court finds that federal law does not entitle Fratta to a certificate of appealability on his other claims should he decide to pursue the issues on appeal. *See* 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 482 (2000).

## CONCLUSION

For the foregoing reasons, the Court **ORDERS** the following:

1.  Petitioner Robert Alan Fratta's Petition for Writ of Habeas Corpus (Instrument No. 1) is provisionally **GRANTED** with respect to his claims involving his confession and the hearsay testimony given at trial. Respondent's summary judgment motion on those grounds is **DENIED**.

2.  Respondent Nathaniel Quarterman, Director, Texas Department of Criminal Justice, Correctional Institutions Division, shall release Petitioner Robert Alan Fratta from custody unless within 180 days the State of Texas institutes new criminal proceedings against him. The 180-day time period shall not commence until the conclusion of any appeal from this Order, either by the exhaustion of appellate remedies or the expiration of the time period in which to file such appellate proceedings.

3.  Respondent Nathaniel Quarterman's Motion for Summary Judgment (Instrument No. 18) is **GRANTED** with respect to all other claims.

4   With the exception of the aforementioned issues, Petitioner Robert Alan Fratta's Petition for Writ of Habeas Corpus is **DENIED**.

5.  A Certificate of Appealability is **DENIED** with respect to the claims rejected by this Court.

Signed at Houston, Texas, this 28th day of September, 2007**.**

_____

**MELINDA HARMON**

**UNITED STATES DISTRICT JUDGE**